**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**OCALA DIVISION**

BARBARA BURROWS,

      Plaintiff,

v.                                     Case No:  5:14-cv-197-Oc-30PRL

THE COLLEGE OF CENTRAL
FLORIDA,

      Defendant.
_____/

## ORDER

    THIS CAUSE comes before the Court upon Defendant's Case Dispositive Motion for Summary Judgment (Doc. 43) and Plaintiff's response in opposition thereto (Doc. 47). The Court, having considered the motion, response, and record evidence, and being otherwise fully advised in the premises, concludes that Defendant's motion should be granted and final judgment entered in favor of Defendant.

## RELEVANT FACTS

**1.  Plaintiff's Employment with Defendant**

    In July 2008, Defendant hired Plaintiff as the Vice President for Instructional Affairs ("VPIA") on an annual contract which was subject to renewal each academic year at Defendant's discretion.[1]   The VPIA reported directly to President Charles Dassance.

_____

[1]During its search for a VPIA, Defendant also considered internal candidate, Dr. Mark Paugh, the former Dean of Health Sciences.  Although Dr. Paugh was not chosen as the VPIA, as a result of a

About a year into her tenure as VPIA, Plaintiff, a gay woman, legally married a woman in the State of Iowa.  Plaintiff told some of the staff about her marriage, and believed that Dr. Dassance may have overheard her discussing it with staff at a meeting, but she never specifically notified Dr. Dassance of her marriage.  Although Dr. Dassance was aware that Plaintiff was gay and had a partner, Dr. Dassance was not aware of Plaintiff's marital status. Plaintiff's first two years as VPIA were otherwise uneventful with Plaintiff receiving above average or meets expectations in her annual evaluations.

**2.  Issues Arise with Plaintiff's Performance as VPIA**

In fall 2010, Dr. Dassance met with Plaintiff to discuss several issues he observed regarding her performance and complaints he received from faculty and staff with respect to her management style.  Namely, Dr. Dassance was concerned with Plaintiff's tendency to micromanage and lose sight of the "big picture," her judgment and candor, and her difficulty transitioning from a lower-level administrator to VPIA.  Dr. Dassance was also concerned that there appeared to be discord among Plaintiff's subordinates and that she did not have a good relationship with faculty.

Plaintiff's recollection of events differs as she does not recall receiving complaints from Dr. Dassance regarding her performance.  Rather, according to Plaintiff, Dr. Dassance informed her that two of her subordinates had expressed concerns to him regarding trust with Plaintiff, and Dr. Dassance suggested that Plaintiff address the issues.   Plaintiff

reorganization orchestrated in part by Plaintiff, Dr. Paugh was later promoted to a newly-created position, Associate Vice President of Liberal Arts and Sciences, which reported to the VPIA.  His former position as Dean of Health Sciences was eliminated, and he assumed the duties of that position in his role as Associate Vice President of Liberal Arts and Sciences.

subsequently met with both individuals and reported to Dr. Dassance that the meetings appeared to go well. Plaintiff asserts that she was not notified of any other issues regarding her performance; in fact, she recounts that Dr. Dassance assured her that her position was secure.

### 3.  Complaints from Faculty and Staff and Negative Anonymous Reviews Regarding Plaintiff

In February 2011, Dr. Dassance received complaints from the Faculty Senate President, Dr. Susan Bradshaw, about Plaintiff. Dr. Bradshaw reported that the faculty members were generally unhappy with Plaintiff. During this conversation, Dr. Dassance also became aware that Plaintiff had shared information with Dr. Bradshaw that Dr. Dassance shared with Plaintiff in confidence. Dr. Dassance spoke with several other faculty members and administrators, who similarly expressed concerns about Plaintiff's management style.

Additionally, as part of Defendant's annual review process, Dr. Dassance solicited anonymous reviews from faculty and others regarding the performance of several administrators, including Plaintiff. Many of the anonymous evaluations about Plaintiff were negative, describing Plaintiff as a micromanager for whom it was difficult to work. Dr. Dassance shared these reviews with Plaintiff and asked to discuss them. Plaintiff was upset by the reviews because she believed they were completed by only one or a few individuals.

### 4.  Plaintiff's Contract as VPIA is Not Renewed

On March 18, 2011, Plaintiff met with Dr. Dassance to discuss the anonymous evaluations and her performance, and Dr. Dassance informed Plaintiff that he was considering not renewing her contract as VPIA for the 2011-2012 academic year.  About a week later, Dr. Dassance told Plaintiff that he was not going to renew her contract.  Dr. Dassance explained that his decision was due to the unresolved issues with Plaintiff's performance that he had discussed with her in fall 2010; namely, Plaintiff's tendency to micromanage and lose sight of the "big picture," her judgment and candor, her difficulty transitioning from a lower-level administrator to VPIA, and her general poor relationship with faculty.

Dr. Dassance asserted that the decision not to renew Plaintiff's contract was made solely by him, was not influenced by anyone else, and was not based upon the anonymous evaluations.  Although Defendant has an employee improvement plan ("EIP") policy, Dr. Dassance did not deem the policy appropriate in Plaintiff's situation given her position as an upper-level administrator.

### 5.  Plaintiff Transfers to Faculty

Plaintiff was given the option to resign as VPIA, and she requested and accepted a transfer to a teaching position in the mathematics department.  Dr. Dassance then announced his retirement as president, and Plaintiff asked that he reconsider his decision not to renew her contract as VPIA.  Dr. Dassance told Plaintiff that he did not believe she was a good fit for the position under any president and he would not change his decision. Dr. Paugh, who had previously been considered for the VPIA position alongside Plaintiff,

was appointed interim VPIA by Dr. Dassance and was eventually offered the position by Dr. Dassance's successor James Henningsen.[2]  Unlike when Plaintiff was hired, Defendant did not advertise the vacancy or conduct interviews.

## 6. Plaintiff's Faculty Salary

When Plaintiff resigned as VPIA, her salary was $113,558.  After considering the Board of Trustee's policy and the salary provided to other faculty in the mathematics department, Dr. Dassance set Plaintiff's annual salary at $52,000.  Dr. Dassance also provided Plaintiff (1) $5,000 for a supplemental duty contract for a special project in the mathematics department, (2) $14,850 in bridge-the-gap pay to compensate for her transition from VPIA to faculty, and (3) an additional financial supplement for Plaintiff's continuing contribution to the Southern Association of Colleges and Schools ("SACS") accreditation visit and Defendant's baccalaureate programs application.  Dr. Dassance did not consult with anyone else in determining Plaintiff's faculty salary.

Plaintiff contends that she was not provided the appropriate prorated salary for her faculty position as delineated in Defendant's salary schedule[3] nor was her salary equivalent to that of similarly-situated individuals in heterosexual marriages who transferred from administration to faculty.  Specifically, Plaintiff asserts that if her salary were correctly calculated in accordance with Defendant's salary schedule, her salary would have been $76,310.71.  Plaintiff raised numerous grievances with Director of Human Resources Gilda

---

[2]Dr. Henningsen explained that he appointed Dr. Paugh to VPIA full time without conducting a search because Dr. Paugh's performance as VPIA was satisfactory.

[3]Defendant's salary schedule provides: "When an individual's contract is changed from faculty to administrator or vice versa, the calculation of salary change shall normally be based on daily rate of pay, unless the president approves an exception."

Crocker, Dr. Paugh, Interim President James D. Harvey, and the newly appointed president, Dr. Henningsen. Each of Plaintiff's appeals for a higher salary were denied.

In denying Plaintiff's appeal, Dr. Henningsen noted that Plaintiff was not a faculty member prior to assuming her position as VPIA and she was not transferred during an active contract (i.e., her contract as VPIA was nonrenewed). Therefore, Dr. Henningsen concluded that Plaintiff's transition to faculty was treated as a new appointment rather than a transfer.

### 7. Plaintiff Files a Charge with the Florida Commission on Human Relations ("FCHR")

Despite her complaints regarding her salary, Plaintiff continued working as faculty in the mathematics department from 2011 until 2013, receiving positive performance reviews. On April 12, 2012, Plaintiff filed a claim of discrimination with the FCHR alleging that her nonrenewal as VPIA was due to her gender, sexual orientation, marital status, failure to conform to Defendant's religious beliefs, and failure to conform to gender stereotypes. For the same reasons, Plaintiff also alleged that her salary as faculty was not calculated in accordance with Defendant's salary schedule. Defendant was notified of Plaintiff's claim in July 2012.

In April 2013, Plaintiff received notification that her annual contract as faculty would be renewed for a third year and that she was eligible to apply for continuing contract, which is the community-college equivalent of tenure. Shortly thereafter, the FCHR issued a "no cause" determination in favor of Defendant, and on June 26, 2013, it issued a notice of dismissal.

**8. Defendant Implements a Reduction in Force and Plaintiff's Position is Eliminated**

After reviewing the budget for the spring 2013 term and the following 2013-2014 academic year, Defendant projected a deficit for both periods based on decreased estimates of student enrollment.  Defendant began analyzing its budget and strategizing solutions to mitigate the expected deficit.  It eventually determined that a reduction in force would be necessary.  In determining which employees would be subject to the reduction in force, Defendant consulted Policy 6.32, which provided, in relevant part:

> In the event it becomes necessary for a reduction in force, the following guidelines will apply: The first priority will be to protect the mission of the College to provide access and quality instruction; thus reduction in force decisions will be guided by what is determined to be most supportive of the core mission (instructional program delivery) of the College.

Policy 6.32 also required that faculty on annual contract be terminated before faculty on continuing contract.

Before Defendant could implement a reduction in force, it had to declare financial exigency, which it did on May 28, 2013.  Defendant first implemented its reduction in force by closing low-revenue programs and through attrition, but eliminating these positions was insufficient to cover the expected deficit.  Defendant ultimately determined that it would eliminate the most recently hired, annual-contract faculty in the departments with the highest full-time to part-time faculty ratios because applying this criteria was consistent with Defendant's core mission.  The science and mathematics departments had the highest full-time to part-time faculty ratios.  As the most recently hired faculty member in the mathematics department on annual contract, Plaintiff's position was eliminated.  Plaintiff was notified that her position was eliminated on May 29, 2013.  Overall, the reduction in

force resulted in the closing of seventeen vacant positions and the elimination of eleven full-time positions, including Plaintiff's.

Plaintiff was scheduled to teach classes for summer and fall 2013. Other full-time faculty were required to cover Plaintiff's summer classes and Plaintiff's fall classes were either cancelled, covered by the remaining full-time faculty, or taught by adjuncts. Plaintiff's termination letter provided that she would be guaranteed an interview for available positions but that she had to notify human resources of any positions in which she was interested. Plaintiff asked James Roe, the mathematics department chair, to be considered for a position as an adjunct, but he declined her request after speaking with Dr. Paugh and Dr. Allan Danuff, Dean of Liberal Arts and Sciences.

## SUMMARY JUDGMENT STANDARD

Motions for summary judgment should be granted only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (internal quotation marks omitted); Fed. R. Civ. P. 56(c). The existence of some factual disputes between the litigants will not defeat an otherwise properly supported summary judgment motion; "the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The substantive law applicable to the claimed causes of action will identify which facts are material. *Id.* Throughout this analysis, the court must examine the evidence in the light most favorable to the nonmovant and draw all justifiable inferences in its favor. *Id.* at 255.

Once a party properly makes a summary judgment motion by demonstrating the absence of a genuine issue of material fact, whether or not accompanied by affidavits, the nonmoving party must go beyond the pleadings through the use of affidavits, depositions, answers to interrogatories and admissions on file, and designate specific facts showing that there is a genuine issue for trial. *Celotex*, 477 U.S. at 324. The evidence must be significantly probative to support the claims. *Anderson*, 477 U.S. at 248-49.

This Court may not decide a genuine factual dispute at the summary judgment stage. *Fernandez v. Bankers Nat'l Life Ins. Co.*, 906 F.2d 559, 564 (11th Cir. 1990). "[I]f factual issues are present, the Court must deny the motion and proceed to trial." *Warrior Tombigbee Transp. Co. v. M/V Nan Fung*, 695 F.2d 1294, 1296 (11th Cir. 1983). A dispute about a material fact is genuine and summary judgment is inappropriate if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 248; *Hoffman v. Allied Corp.*, 912 F.2d 1379, 1383 (11th Cir.1990). However, there must exist a conflict in substantial evidence to pose a jury question. *Verbraeken v. Westinghouse Elec. Corp.*, 881 F.2d 1041, 1045 (11th Cir. 1989).

## DISCUSSION

### 1. Gender Discrimination (Count I)

Plaintiff asserts a claim against Defendant for gender discrimination under Title VII and the Florida Civil Rights Act ("FCRA") related to her nonrenewal as VPIA and her replacement with a male subordinate.[4] Title VII and the FCRA prohibit employment

---

[4]Because federal law construing Title VII applies to the FCRA, the Court only discusses federal law pertinent to Title VII, but notes that the law applies equally to Plaintiff's FCRA claims. *See Albra v.*

discrimination on the basis of race, color, religion, sex, or national origin. 42 U.S.C.

§ 2000e-2(a)(1); Fla. Stat. § 760.10(1). A plaintiff may establish a prima facie case of

discrimination through either direct or circumstantial evidence. *See Jackson v. Rooms To*

*Go, Inc.*, No. 8:06-cv-01596-T-24EAJ, 2008 WL 2824814, at *5 (M.D. Fla. July 21, 2008)

(citing *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998)). Because

the record is clear that there is no direct evidence of discrimination, Plaintiff must prove

her claim through the *McDonnell Douglas* burden-shifting framework. *See McDonnell*

*Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).

### A. *McDonnell Douglas* Burden-Shifting Framework

Under this framework, Plaintiff must first establish a prima facie case of

employment discrimination. *See id.* If Plaintiff establishes a prima facie case, the burden

then shifts to Defendant to articulate some legitimate, nondiscriminatory reason for the

employment action. *Id.* If Defendant meets this burden of production, the presumption of

discrimination raised by Plaintiff's prima facie case is rebutted. *See Tex. Dep't of Cmty.*

*Affairs v. Burdine*, 450 U.S. 248, 254-56 (1981). Plaintiff must then show that Defendant's

proffered legitimate, nondiscriminatory reason is pretextual. *Id.*

Plaintiff established a prima facie case of gender discrimination, which Defendant

does not dispute. Consequently, the burden shifted to Defendant to articulate a legitimate,

nondiscriminatory reason for its decision not to renew Plaintiff's contract as VPIA. Dr.

---

*Advan, Inc.*, 490 F.3d 826, 834 (11th Cir. 2007); *City of Hollywood v. Hogan*, 986 So. 2d 634, 641 (Fla. 4th DCA 2008).

Dassance explained that he decided not to renew Plaintiff's VPIA contract due to issues with her performance: specifically, Plaintiff had a tendency to micromanage and lose sight of the "big picture," she was distrusted by faculty, and she was unable to adapt to her role as VPIA.   As such, Defendant has offered a legitimate, nondiscriminatory reason for Plaintiff's nonrenewal as VPIA, and the burden shifts back to Plaintiff to establish that Defendant's nondiscriminatory reason was pretext for discriminatory animus.

### B. Pretext

To establish pretext, Plaintiff must show that Defendant's "'explanation is unworthy of credence.'"  *Jackson v. Ala. State Tenure Comm'n*, 405 F.3d 1276, 1289 (11th Cir. 2005) (quoting *Tex. Dep't of Cmty. Affairs*, 450 U.S. at 256).   This requires showing "*both* that the reason was false, *and* that discrimination was the real reason" for the adverse action. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993) (internal quotation marks omitted).   Plaintiff may show pretext by pointing to "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in Defendant's proffered reason.  *Brooks v. Cnty. Comm'n of Jefferson Cnty.*, 446 F.3d 1160, 1163 (11th Cir. 2006) (internal quotation marks omitted).   Plaintiff may also produce other evidence "which permits the jury to reasonably disbelieve the employer's proffered reason."  *Steger v. Gen. Elec. Co.*, 318 F.3d 1066, 1079 (11th Cir. 2003) (internal quotation marks omitted).

To establish that Defendant's proffered reason for the nonrenewal of her contract as VPIA was pretext, Plaintiff points to three facts which she asserts establishes "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in Defendant's proffered reason: (i) Plaintiff was replaced with a male subordinate who was previously

rejected as VPIA; (ii) Defendant did not follow its internal procedures by placing Plaintiff

on an EIP prior to her nonrenewal; and (iii) Defendant requested that Plaintiff continue

several of her duties as VPIA after her contract was nonrenewed.

### i. Plaintiff's Replacement as VPIA with a Male Subordinate

In asserting that Defendant's proffered reason for her nonrenewal was pretext for

discrimination, Plaintiff first highlights that her replacement, Dr. Paugh, was originally her

runner-up for VPIA when she was selected in 2008 and that his appointment as her

successor violated Defendant's hiring policies.  Plaintiff does not argue that Dr. Paugh was

unqualified to perform the role and fails to otherwise articulate the significance that he was

not ultimately selected for the position in 2008.   As Plaintiff emphasizes, Dr. Paugh

previously underwent the very same vetting process for VPIA as Plaintiff.  Accordingly,

Plaintiff's argument that the circumstances of Dr. Paugh's appointment establish pretext is

unpersuasive.

Plaintiff next alleges in a conclusory fashion that Dr. Paugh's appointment as VPIA

was in violation of Defendant's hiring policy which required a search and selection process

to fill an administrative vacancy.  No evidence exists that Defendant had a formal policy

that required a search and selection process to fill an administrative vacancy.[5]  Rather,

Plaintiff argues that such process was Defendant's general practice.

---

[5]Plaintiff references Defendant's employee handbook, which states that Defendant *may* advertise job vacancies in various outlets, but does not *mandate* advertisement of job vacancies.  Tellingly, the handbook does not provide that Defendant is required to conduct a search and selection process to fill a vacancy.

In support of her position, Plaintiff highlights several administrative vacancies that were filled by a search and selection process, including the positions of Vice President of Student Affairs and Vice President of Administration and Finance. Plaintiff contends that Lynn Powel, who was appointed Interim Vice President for Student Affairs, was required to apply for the position and participate in a search and selection process. Although evidence exists that Defendant utilizes a search and selection process to fill vacancies, evidence also exists that this process was not followed in all instances. As Plaintiff herself points out, Dr. Paugh's previous appointment as Associate Vice President for Liberal Arts and Sciences was done without a search and selection process.

Even assuming that Defendant's general hiring practice was to conduct a search and selection process to fill an administrative vacancy, Dr. Paugh's appointment does not appear to violate the general intent and spirit of that policy. Although Dr. Paugh did not undergo a search and selection process when he was appointed as VPIA in 2011, Dr. Paugh did undergo that process in 2008. Plaintiff has not presented evidence of a candidate similarly situated to Dr. Paugh who was required to undergo a second time the search and selection process to be considered for the same position.

Plaintiff has failed to present sufficient evidence from which it can be determined that Defendant employed either a formal or informal policy and failed to follow it with regard to the appointment of Dr. Paugh. And, even if the Court assumes that Defendant adhered to a search and selection process for the appointment of administrators, Plaintiff has not demonstrated that Plaintiff failed to follow that procedure in this case. Also, assuming, arguendo, that Defendant failed to adhere to its policy in appointing Dr. Paugh

to VPIA, Plaintiff has not established how this departure demonstrates discriminatory animus. *See Mitchell v. USBI Co.*, 186 F.3d 1352, 1355-56 (11th Cir. 1999) ("Standing alone, deviation from a company policy does not demonstrate discriminatory animus."); *see also Tori v. Marist Coll.*, 344 F. App'x 697, 701 (2d Cir. 2009) ("While departures from tenure procedures can raise a question as to the good faith of the process where the departure may reasonably affect the decision, summary judgment is appropriate where there is no evidence that discrimination played a role in any alleged procedural irregularities." (internal quotation marks omitted)).

As such, Plaintiff has not established pretext in this regard.

### ii.  Plaintiff was Not Provided the Benefit of an EIP

Next, Plaintiff contends that Defendant's failure to follow its established employment policies in deciding not to renew Plaintiff's contract as VPIA demonstrates that Defendant's explanation for Plaintiff's nonrenewal is pretext for discrimination. Plaintiff argues that pursuant to Defendant's own policies as incorporated into her administrative contract, she should have had the benefit of an EIP, which Dr. Dassance readily admits that he did not apply in Plaintiff's case.  Plaintiff asserts that the EIP was mandatory, but has provided no evidence, for example, a copy of the relevant policy, to support her claim beyond her own allegations.  On the other hand, Dr. Dassance asserts that implementation of an EIP is not mandatory and he did not consider it necessary in Plaintiff's case.[6]  *See Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1990)

---

[6] Dr. Paugh also admitted that Defendant had an EIP policy in place, but that it was not mandatory. Plaintiff asserts that Dr. Paugh testified that the EIP policy was not followed only in extreme circumstances.

(noting that conclusory allegations will not suffice to defeat a motion for summary judgment).

Plaintiff served as VPIA on an annual contract subject to renewal each year.  She was not guaranteed employment beyond that period, and the overwhelming evidence of record is that the administrators served at the discretion of the president.  Plaintiff has not provided any evidence of an upper-level administrator who was provided the benefit of an EIP in the context of nonrenewal nor has she provided any evidence beyond her own assertion that an EIP was mandatory.  Plaintiff has therefore not demonstrated that Defendant departed from an established policy or procedure.  Furthermore, even assuming that Plaintiff was entitled to an EIP, she has presented no evidence showing that discrimination played a role in Dr. Dassance's decision not to apply an EIP in Plaintiff's case.  *See Mitchell*, 186 F.3d at 1355-56.

Accordingly, Defendant's failure to provide Plaintiff the benefit of an EIP does not establish pretext.

### iii.  Plaintiff Continued to Perform Duties as VPIA After Her Contract was Nonrenewed

Finally, Plaintiff argues that allowing her to continue to perform her duties as VPIA after her contract was nonrenewed casts doubt upon Dr. Dassance's characterization of her performance and establishes that the complaints regarding her performance were pretext.

---

However, Dr. Paugh discussed the inapplicability of an EIP in the context of *immediate* termination and not in the context of nonrenewal of a contract.  Dr. Paugh also clarified that the VPIA serves at the president's discretion.  Similarly, Dr. Danuff testified that it was his belief that administrators "serve at the pleasure of the President."

After Plaintiff's contract as VPIA was nonrenewed, Dr. Dassance allowed Plaintiff to continue to assist with the SACS interim report and baccalaureate program review, for which Plaintiff was compensated. Plaintiff's continued work on the SACS accreditation and baccalaureate program review is not inconsistent with Dr. Dassance's reason for her nonrenewal. Dr. Dassance's complaints with Plaintiff's performance primarily focused on her managerial, leadership, and interpersonal skills, not the substantive quality of the work she performed. Plaintiff has not alleged that her continued work on the SACS process involved supervision of other administrators or faculty. Thus, Plaintiff's assertion does not demonstrate that Dr. Dassance's explanation is "unworthy of credence." *Jackson*, 405 F.3d at 1289.

Because Plaintiff failed to meet her burden in demonstrating that Defendant's explanation for nonrenewal of her contract as VPIA was pretext, Defendant is entitled to summary judgment on Plaintiff's claim for gender discrimination.

**2. Marital Status Discrimination (Count III)**

Plaintiff also asserts a claim for marital status discrimination under the FCRA based upon Defendant's failure to properly compensate Plaintiff when she was transferred to a faculty position. Plaintiff alleges that she was not compensated at a rate comparable to similarly-situated individuals who were in opposite-sex marriages.

Unlike Title VII, the FCRA prohibits discrimination based upon marital status in employment. Fla. Stat. § 760.10(1)(a). The Florida Supreme Court held that "marital status" under the FCRA "means the state of being married, single, divorced, widowed or separated, and does not include the specific identity or actions of an individual's spouse."

16

*Donato v. Am. Tel. & Tel. Co.*, 767 So. 2d 1146, 1155 (Fla. 2000).  Plaintiff's claim for marital status discrimination fails.

First, Plaintiff failed to establish a prima facie case of marital status discrimination. To state a prima facie case for marital status discrimination, Plaintiff must produce some evidence to suggest that her marital status played a role in the determination of her salary. *Cf. Hunter v. United Parcel Serv., Inc.*, 697 F.3d 697, 703 (8th Cir. 2012) ("As a general matter, an employee must produce some evidence of a connection between the protected status and the adverse employment action.  For protected classes that are not readily apparent, showing the needed connection would typically require showing that the employer was aware.").  Dr. Dassance was not aware of Plaintiff's same-sex marriage. And Plaintiff has presented no evidence that he was aware of it.  It logically follows that if Dr. Dassance, the sole decisionmaker as to Plaintiff's faculty salary, was unaware that Plaintiff was married, and Plaintiff presented no evidence to the contrary, then Plaintiff's marital status could not have factored into Dr. Dassance's decision.

Second, even if Plaintiff could establish a prima facie case for marital status discrimination, Defendant has articulated a legitimate, nondiscriminatory reason for Plaintiff's differential treatment regarding her salary as faculty.  Dr. Dassance explained that Plaintiff's salary was determined by reviewing board policy and the salary of other faculty in the mathematics department.  Plaintiff alleges that she should have been entitled to calculation of her salary based upon her status as a transfer.  Dr. Henningsen clarified that Plaintiff was not treated as a transfer because her contract was in nonrenewal status. Rather, in determining Plaintiff's rate of pay as faculty, Plaintiff was treated as a new hire.

Plaintiff has not provided any evidence, beyond her own conclusory allegations, that rebuts Dr. Dassance's authority to treat Plaintiff as a new hire.

Even if Dr. Dassance was required to adhere to the policy articulated in the salary schedule for transfers from administration to faculty, the policy allowed Dr. Dassance discretion, as Plaintiff admitted.[7]  Namely, the policy provided: "When an individual's contract is changed from faculty to administrator or vice versa, the calculation of salary change *shall normally* be based on daily rate of pay, *unless the president approves an exception*."  (Emphasis added).  By the explicit terms of the policy on which Plaintiff relies, Dr. Dassance was entitled to make an exception and it was within Dr. Dassance's authority to depart from the salary schedule.  Dr. Dassance explained that he set Plaintiff's faculty salary commensurate with other salaries in the mathematics department.  The evidence does not suggest otherwise, and Plaintiff has provided no evidence which impugns this explanation.

Defendant is entitled to summary judgment on this claim.

### 3. Gender Stereotype Discrimination (Count IV)

Next, Plaintiff asserts a claim for gender stereotype discrimination under Title VII and the FCRA based upon Plaintiff's assertion that Defendant failed to appropriately compensate Plaintiff as faculty because of Plaintiff's failure to conform to gender norms. Plaintiff argues that Defendant believed that having a relationship with a man is an essential

---

[7]In fact, in Plaintiff's complaints to both Board Member Cory Pool and Ms. Crocker in human resources, Plaintiff admits that Dr. Dassance was within his authority under the "exception" clause to determine Plaintiff's salary outside the standard provided for in the salary schedule.

part of being a woman and that since Plaintiff was in a relationship with a woman, she failed to conform to this gender norm.  As articulated in *Price Waterhouse v. Hopkins*, 490 U.S. 228, 251 (1989), an employee who is subjected to adverse employment action because of his or her employer's animus toward an exhibition of gender-nonconforming behavior may have a claim under Title VII.

Plaintiff has failed to establish a prima facie claim of gender stereotype discrimination.  Plaintiff's claim, although cast as a claim for gender stereotype discrimination, is merely a repackaged claim for discrimination based on sexual orientation, which is not cognizable under Title VII or the FCRA.[8]  *See, e.g.*, *Anderson v. Napolitano*, No. 09-60744-CIV, 2010 WL 431898, at *4 (S.D. Fla. Feb. 8, 2010) ("The law is clear that Title VII does not prohibit discrimination based on sexual orientation."); *Mowery v. Escambia Cnty. Utils. Auth.*, No. 3:04CV382-RS-EMT, 2006 WL 327965, at *9 (N.D. Fla. Feb. 10, 2006) ("[C]ase law throughout the circuits consistently holds that Title VII provides no protection for discrimination based on sexual orientation.").

Plaintiff's theory of gender stereotyping is misplaced.  Generally, gender stereotyping is concerned with characteristics "readily demonstrable in the workplace,"

---

[8]Plaintiff also describes several comments allegedly made by Joan Stearns regarding Plaintiff's style of dress.  For example, Plaintiff recounted that Ms. Stearns made comments about Plaintiff's lack of style and that she did not dress professionally.  But Plaintiff does not address Ms. Stearns' comments in her response to Defendant's motion for summary judgment and instead relies on her contention that her gender stereotyping claim arises from Defendant's belief that Plaintiff was not feminine because she was in a same-sex relationship with a woman.  Regardless, Ms. Stearns was not Plaintiff's superior and not in a position to take adverse employment action against Plaintiff on the basis of whatever beliefs she might have held.  *See Barsorian v. Grossman Roth, P.A.*, 572 F. App'x 864, 870 (11th Cir. 2014) (noting that a discriminatory comment made by a nondecisionmaker was not sufficient to create a genuine issue of material fact precluding summary judgment).

such as behaviors, mannerisms, and appearances. *See Vickers v. Fairfield Med. Ctr.*, 453 F.3d 757, 763 (6th Cir. 2006). Plaintiff's relationship with a woman was not a characteristic readily demonstrable in the workplace, and Plaintiff provides no other evidence of discrimination based on her failure to conform to a feminine stereotype. *See, e.g.*, *Pagan v. Gonzalez*, 430 F. App'x 170, 171-72 (3d Cir. 2011) (finding that a gender stereotyping claim was really a claim based on sexual orientation because Plaintiff failed to provide any evidence that the discrimination she suffered was based on her acting in a masculine manner); *Dawson v. Bumble & Bumble*, 398 F.3d 211, 218 (2d Cir. 2005) (recognizing that "a gender stereotyping claim should not be used to bootstrap protection for sexual orientation into Title VII" (internal quotation marks omitted)); *Jantz v. Emblem Health*, No. 10 Civ. 6076(PKC), 2012 WL 370297, at *7 (S.D.N.Y. Feb. 6, 2012) (concluding that the plaintiff failed to establish a claim of discrimination based on a failure to conform to gender stereotype where the plaintiff asserted that she was "discriminated against due to the fact that she was a woman who was attracted to and/or sought relationships with other women").

Additionally, even assuming Plaintiff could establish a prima facie case of gender stereotype discrimination, Plaintiff's claim fails for the same reasons as her claim for marital status discrimination, i.e., Plaintiff failed to demonstrate that Defendant's proffered reason for setting her faculty salary was pretext for gender stereotype discrimination.

Because Plaintiff's gender stereotyping claim is truly a claim for discrimination based on Plaintiff's sexual orientation, Defendant is entitled to summary judgment on this claim.

### 4. Retaliation (Count V)

Finally, Plaintiff asserts that her termination was motivated by the filing of her FCHR complaint. Both Title VII and the FCRA prohibit retaliation against an employee for opposing a discriminatory employment practice or for participating in an investigation or proceeding concerning employment discrimination. 42 U.S.C. § 2000e-3(a); Fla. Stat. § 760.10(7). Where there is no direct evidence of retaliation, as in this case, a court must apply the *McDonnell Douglas* burden-shifting framework. *See Brown v. Ala. Dep't of Transp.*, 597 F.3d 1160, 1181 (11th Cir. 2010) (citing *McDonnell Douglas*, 411 U.S. 792, 802-04).

### A. *McDonnell Douglas* Burden-Shifting Framework

First, the employee must establish a prima facie case of retaliation by showing that (1) she engaged in statutorily protected activity, (2) she suffered a materially adverse employment action, and (3) there is a causal relationship between the protected activity and the adverse employment action. *Id.* A plaintiff must also demonstrate "that his or her protected activity was a but-for cause of the alleged adverse action by the employer." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2534 (2013); *see also Smith v. City of Fort Pierce*, 565 F. App'x 774, 778 (11th Cir. 2014). Once a plaintiff establishes a prima facie case of retaliation, the employer has an opportunity to articulate a nonretaliatory reason for its action, which can then be rebutted by the employee by evidence of pretext. *See Brown*, 597 F.3d at 1181-82.

Plaintiff has established that she engaged in a protected activity—the filing of her FCHR complaint—and suffered an adverse employment action—termination. At issue,

however, is whether Plaintiff has adequately established a causal connection between the filing of her FCHR complaint and her termination.

## B. Causal Connection

A plaintiff can establish a causal connection by showing that the defendant was "aware of the protected conduct, and that the protected activity and the adverse actions were not wholly unrelated." *Shannon v. Bellsouth Telecomms., Inc.*, 292 F.3d 712, 716 (11th Cir. 2002) (internal quotation marks omitted). Generally, in the absence of other evidence, an employee can establish a causal connection by showing a "very close" temporal proximity between the protected activity and the adverse action. *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007).

More than a year elapsed between when Plaintiff filed her FCHR complaint and her termination, which is insufficient, standing alone, to establish a causal connection. *See Webb-Edwards v. Orange Cnty. Sheriff's Office*, 525 F.3d 1013, 1029 (11th Cir. 2008) (holding that an almost six-month gap between a complaint and a failure to transfer was insufficient to establish a causal connection); *Thomas*, 506 F.3d at 1364 (holding that a "three to four month disparity between the statutorily protected expression and the adverse employment action is not enough").[9] Because Plaintiff cannot rely on temporal proximity, Plaintiff highlights other evidence that she believes establishes a causal connection between her FCHR complaint and her termination, including that (i) Defendant did not

---

[9]Plaintiff implies that the temporal proximity between her receipt of the FCHR's no-cause determination and her termination is significant, but Plaintiff's contention is without merit. *Cf. Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (indicating that the receipt of a right-to-sue letter is not a protected activity); *Curtis v. Broward Cnty.*, 292 F. App'x 882, 885 (11th Cir. 2008) (measuring the temporal gap from the filing of a complaint and not from receipt of the right-to-sue letter).

comply with its reduction-in-force policy when deciding to eliminate Plaintiff's position and (ii) Defendant would not hire Plaintiff as an adjunct for the summer or fall 2013 semesters.

### i. Defendant Failed to Comply with its Reduction-in-Force Policy

As to Plaintiff's first contention, Policy 6.32 provided, in relevant part, that in the event a reduction of force was necessary,

> [t]he first priority will be to protect the mission of the College to provide access and quality instruction; thus, reduction in force decisions will be guided by what is determined to be most supportive of the core mission (instructional program delivery) of the College.

Defendant determined that eliminating the most recently-hired faculty on annual contract in the departments with the highest ratio of full-time to part-time faculty was most supportive of the College's mission.

Plaintiff disagrees and alleges that this criteria does not fall within Policy 6.32 and that Defendant deviated from its policy in eliminating Plaintiff's position. Plaintiff's argument is not persuasive. The first tenet of Policy 6.32 is broad and could encompass any variety of factors or criteria.[10] Rather, the first guideline seems to be one of discretion. It is not for this Court to second-guess the decisions of Defendant regarding what is most supportive of Defendant's "core mission." *See Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1266 (11th Cir. 2010) ("We do not sit as a 'super-personnel department,' and it

---

[10]Plaintiff points to the depositions of Dr. Paugh and Dr. Danuff, arguing that Dr. Paugh and Dr. Danuff admitted that the criteria applied by Defendant was not contained in the reduction of force policy. Plaintiff's characterization of their testimony is misleading. Dr. Paugh testified that the exact criteria, the full-time to part-time faculty ratio, was not in the policy, but he did not state that it was his belief that the criteria was violative of the policy. Similarly, Dr. Danuff admitted that the criteria was not precisely contained in the policy.

is not our role to second-guess the wisdom of an employer's business decisions—indeed the wisdom of them is irrelevant—as long as those decisions were not made with a discriminatory motive."). More important, Plaintiff has not provided any evidence that this decision was motivated by Plaintiff's filing of a complaint with the FCHR. *See Tori v. Marist Coll.*, 344 F. App'x 697, 701 (2d Cir. 2009) (holding that "summary judgment is appropriate where there is no evidence that discrimination played a role in any alleged procedural irregularities"). Thus, Plaintiff's allegation that Defendant did not adhere to its reduction-in-force policy does not support a causal connection between her termination and protected activity.

### ii. Defendant Would Not Provide Plaintiff an Adjunct Position for the Summer or Spring 2013 Semesters

Plaintiff next asserts that Defendant's decision to terminate her position was motivated by the filing of her FCHR complaint because Defendant would not hire Plaintiff for an adjunct position for the summer or fall semesters in 2013. As to the summer 2013 semester, Defendant did not hire any adjunct faculty. Rather, full-time faculty were utilized to cover Plaintiff's summer classes. Accordingly, whether Defendant would or would not have hired Plaintiff as an adjunct for summer 2013 is irrelevant as there were no adjunct positions available. Plaintiff further argues that it would have been more cost effective to hire her as an adjunct rather than have her classes covered by full-time faculty. But it is not for this Court to second-guess Defendant's business decisions and to determine whether they were wise or effective. *See Godby v. Marsh USA, Inc.*, 346 F. App'x 491,

494 (11th Cir. 2009) (noting that a court should not second-guess the business judgment of employers).

As to the fall 2013 semester, Dr. Paugh testified that Defendant hired adjuncts in the mathematics department.  But according to Mr. Roe, those adjuncts would have been hired prior to May 2013 when the fall schedule was completed and before Plaintiff's position was terminated.  No evidence exists that Defendant posted a vacancy for an adjunct position after Plaintiff was terminated to which she applied and did not receive consideration.[11]  Although Mr. Roe testified that he did not believe he could interview Plaintiff for an open adjunct position if one had existed, his belief is irrelevant as there is no evidence that an opening *was* available.  Because there was no *open* adjunct position available for fall 2013, Defendant's decision not to hire Plaintiff as an adjunct for that semester is not probative of Defendant's retaliatory intent and does not establish a causal connection between her FCHR complaint and the elimination of her position.

Because Plaintiff has failed to establish that her FCHR complaint was the but-for cause of her termination, Defendant is entitled to summary judgment on this claim.

## CONCLUSION

Accordingly, it is therefore **ORDERED AND ADJUDGED** that:

1.  Defendant's Case Dispositive Motion for Summary Judgment (Doc. 43) is GRANTED.

---

[11]Even if a vacancy were available, no evidence exists that Plaintiff formally applied for a position as an adjunct.  Although Plaintiff testified that she applied to be considered for an adjunct position for the fall 2013 semester, Mr. Roe testified that he did not believe Plaintiff formally applied.  Moreover, pursuant to Plaintiff's termination letter, Plaintiff was required to notify human resources that she was interested in an available position.  Plaintiff has presented no evidence that she complied with this requirement.

2.   The Clerk is directed to enter final judgment in favor of Defendant, terminate

any pending motions, and close the case.

**DONE** and **ORDERED** in Tampa, Florida, this 13th day of July, 2015.

_____
JAMES S. MOODY, JR.
UNITED STATES DISTRICT JUDGE

Copies furnished to:
Counsel/Parties of Record